**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Elaine V. Pletsch, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | Case No. 1:08-cv-26 |
| | ) | |
| Defendant. | ) | |

Plaintiff Elaine V. Pletsch seeks judicial review of the Social Security Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  Chief Judge Hovland has referred this matter to the undersigned for preliminary consideration.

## I.    BACKGROUND

### A.    Procedural History

Pletsch filed an application for DIB on July 13, 2004, alleging a disability onset date of May 8, 2001. (Tr. 61).  A protective filing date was established as of June 30 , 2004, the date she was last insured for DIB purposes. (Tr. 83).  She alleged her disability was due to chronic fatigue syndrome ("CFS") that may also be exacerbated by restless leg syndrome ("RLS").  (Tr. 87-88).  Her applications were denied initially on August 18, 2004, and upon reconsideration on January 25, 2005, prompting her to request a hearing before an administrative law judge ("ALJ"), which was held on March 29, 2006.  (Tr. 44, 50, 443).

The ALJ issued his written opinion on May 22, 2006, finding that Pletsch was not disabled within the meaning of the applicable regulations and therefore not entitled to disability insurance benefits. (Tr. 17-26). Pletsch requested that the Appeals Council review the ALJ's decision. (Tr. 13). She learned by letter dated February 6, 2008, that the Appeals Council had denied her request for review and adopted the ALJ's decision as the Commissioner's final decision. (Tr. 5-8).

Pletsch initiated the above-captioned action on February 21, 2008, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). See Docket No. 1. The parties filed their respective Motions for Summary Judgement and the matter is ripe for the court's consideration. See Docket Nos. 7 and 14.

### B.     General Background

Pletsch was born in July 1962 and was 43 at the time of the hearing before the ALJ. (Tr. 61, 447). She did not graduate from high school but did obtain a general equivalency diploma. (Tr. 450). She served in the Air Force from March 1980 until January 1982. (Tr. 451). She studied software engineering for two years but did not obtain a degree. (Tr. 450). She is divorced and has no children. (Tr. 448). At the time of the hearing, she was living in her mother's basement in Killdeer, North Dakota. (Tr. 448). She last worked in a full-time competitive setting in 1997. (Tr. 454). She has no health insurance. (Tr. 455). She received private disability benefits of $1,771.09 per month from December 1999, to February 2006. (Tr. 455).

### C.    Medical and other relevant history

#### 1.    Diagnosis of chronic fatigue and the award of private disability benefits while living in Oregon

Pletsch was diagnosed with having chronic fatigue syndrome in 1997 while she was living in Portland, Oregon, the onset of which may have followed or been exacerbated by a bout with pneumonia.  At the time, Pletsch had been working for approximately six years full-time as a technical writer for Infomedics writing handbooks.  Except for 1997 when she became sick and earned only $23,074.02, her earnings averaged just under $35,000 per year.  (Tr. 68, 303, 324, 350-352, 355-356).

Prior to that, Pletsch had worked in tech-support for a medical software company for about a year-and-half and before that as a data administrator for a power company for about three years. Overall, the record reflects that until Pletsch became sick in 1997, she had been consistently employed for approximately ten years following her two years of school after her military service. (Tr. 68).

Pletsch has a prior history of alcoholism.  However, she underwent treatment in 1994.  Since that time, the record reflects that her alcoholism has been in remission.  During the time period under consideration in this case, she periodically attended AA and also counseling, which, in part, was preventive with respect to this issue.  (Tr. 304, 349, 350-351).

The record contains a letter from her treating physician in Portland dated March 6, 1998, in which he states that Pletsch has been suffering from a syndrome of protracted fatigue and other associated symptoms since mid-July 1997 and that Pletsch was capable of working only two to three days with the hope there could be some future improvement.  (Tr. 303).  There is also a letter from Pletsch's counselor dated April 14, 1998, expressing the same opinions and limiting her work to

3

either 2-3 hours a day for a five-day workweek or 4 hours per day for a three-day workweek.  (Tr. 304).

During the 1998 to 2000 time frame, Pletsch did work part-time doing data entry and typing for two Portland firms, earning less than $1,500 per year.  (Tr. 356).  The record contains a letter dated October 10, 2000, from a person who worked with Pletsch on both jobs and who was her supervisor for one of them.  The writer stated that Pletsch was hired for one of the jobs with the idea that she would work only 15 hours, but the job ended up demanding more and Pletsch was unable to keep up and became fatigued.  The writer stated she personally observed the fact that Pletsch would become fatigued toward the end of her shift and that her performance would vary depending upon how she would feel that day.  (Tr. 80).

Pletsch underwent a comprehensive neuropsychological evaluation on November 22, 1999. (Tr. 305).  She reported fatigue, problems with attention, concentration, memory, muscle pain and weakness, headaches and a low-grade fever.  (Tr. 305-10).  Her full scale IQ was 126.  (Tr. 307). She was diagnosed with mild-to-moderate Major Depressive Disorder, which was stabilized with medication, cognitive disorder NOS for attention, concentration and mental control, polysubstance dependence in remission, dysthymic disorder, obsessive-compulsive personality features, and chronic fatigue syndrome.  (Tr. 309).  The exam lasted 3 ½ hours.  (Tr. 305).  The examiner noted she became pale and fatigued as the exam progressed. (Tr. 310).  The examiner concluded she could work no more than 90 minutes a day and was not competitively employable.  (Tr. 310).

In 1999, a private insurance carrier awarded Pletsch disability benefits that continued until shortly before the ALJ's hearing in 2006 in this case.   It appears that the award was likely made based upon the above-described Oregon medical evidence.

**2.      Move to North Dakota and the earlier denial of social security benefits**

Pletsch moved to Kildeer, North Dakota, in September 2000 to be closer to family and also because of the lower costs of living.  (Tr. 324, 344).   Although the record is not entirely clear, it appears Pletsch applied for social security disability benefits prior to moving to North Dakota, but was turned down around the time of her move.  (Tr. 343-344, 355).  The exact reasons for the denial are not apparent from the record, but there is some reference to Pletsch believing it was because the agency had concluded her inability to work was the result at that point of somatization and not chronic fatigue.  (Tr. 344).

The ALJ in this case did not discuss the prior case or indicate in his opinion that he was relying upon the prior denial.

**3.      Medical treatment, evaluation, and counseling 2000 and early 2001**

Upon moving to North Dakota, Pletsch saw Dr. Danuta Komorowska at the Great Plains Clinic, P.C., in Dickinson four times from September 2000 through the end of the year about her complaints of chronic fatigue.  Overall, he concluded  that, whether it was called chronic fatigue syndrome or something else, that Pletsch's disability was more emotional and psychological than it was physical.  He encouraged her to make some lifestyle changes, seek assistance from Badlands Human Services for counseling, and follow through on an attempt to obtain work.  (Tr. 401-405). The Badlands Human Service Center (BHSC) is one of eight regional centers that provides human services to North Dakota residents and is part of the North Dakota Department of Human Services, a state agency.

When the recommendation was made that Pletsch seek assistance from BHSC, she already had done so.  Pletsch completed an administrative intake with Sheila Murphy, a vocational

rehabilitation counselor at BHSC, on September 28, 2000. During the intake, Pletsch provided a history of her medical problems and her work history. In the intake summary, Murphy reported that Pletsch appeared anxious over the possibility of losing her private disability benefits. She also noted that Pletsch did not appear tired or stressed, but reported that Pletsch had stated she had "spells" when she was much less functional. (Tr. 355-356).

Pletsch also underwent an intake evaluation for counseling services at BHSC in November 2000. The result of the intake was that she qualified for counseling services. (Tr. 352-354). She then began seeing therapist Claudia Ziegler, MSED, in December 2000. (Tr. 317). At least some of Ziegler's counseling notes are included in the record. (Tr. 428-430).

Also, beginning in early 2001, Pletsch began seeing Dr. Wolf at the Great Plains Clinic in Dickinson to follow up on her complaints of chronic fatigue. There is some suggestion in the record that she switched doctors because she believed that her primary problem was chronic fatigue, as had already been diagnosed in Oregon, and not depression as suggested by Dr. Komorowska. (Tr. 139, 146). Dr. Wolf continued to see Pletsch through the time period relevant to Pletsch's claim in this case and his opinions and course of treatment will be addressed in more detail later.

In March 2001, which was two months before the alleged disability onset date, Pletsch underwent a one-hour mental status examination by psychiatrist Leonard Conradson, M.D., at BHSC at the request of Pletsch's counselor Claudia Ziegler. (Tr. 350-51). Dr. Conradson found that Pletsch was alert and oriented, had an anxious but appropriate mood, a reasonably reactive affect, and did not have a thought disorder. (Tr. 351). He concluded that Pletsch's cognitive skills were intact, and while she said that she became fatigued and could no longer concentrate after 90 minutes of interaction, there was no evidence of that in Dr. Conradson's one-hour session. (Tr. 351). Dr. Conrad's diagnostic impressions were: Axis I - an adjustment disorder with mixed anxiety and

depression; Axis II - no diagnosis; Axis III -  Chronic Fatigue Syndrome; Axis IV - stress relative to chronic physical illness and unemployment; and Axis V Global Assessment of Functioning (GAF) score of 60.  (Tr. 351).  He noted that Pletsch did not wish to take antidepressant medication believing she did not need it, but that she would attend counseling sessions with Ziegler every six weeks.  (Tr. 351).

>        **4.      Part-time work during 2001 through 2004 and the observations and opinions of therapist Ziegler,  Dr. Boomgaarden, and others**

In 2001, Pletsch did seek out part-time work and began working at the Head Start program 20 hours per week.   As discussed later, the critical issue in this case is whether Pletsch was able to work full-time on a consistent basis.  Consequently, the evidence relating to Pletsch's attempts to work, along with the observations of her doctors, counselors, employers, and others with respect to the  efforts she did undertake are obviously relevant.  And, because the ALJ failed to discuss most of  this evidence, it will be set forth in some detail.

On May 12, 2001, which was four days after the alleged disability onset date,  Pletsch presented to Dr. Wolf  for a follow-up visit.  (Tr. 393).  She reported that she was "very tired," but that she was working four hours per day, 20 hours per week, in a primarily seated job.  (Tr. 393).  She said the job had "not aggravated her chronic fatigue, but she still [was] very tired during the time she [was] working."  (Tr. 393).  Pletsch said she hoped to pick up more hours "if things get better." (Tr. 393).  Dr. Wolf adjusted her medications.  (Tr. 393).

Two days later, on May 14, 2001, Pletsch saw therapist Ziegler for an afternoon counseling session after she had completed a four-hour shift in the morning.  Pletsch reported that she was working 20 hours per week for Head Start "to see how much she can tolerate."  (Tr. 428).  Pletsch reported difficulty completing daily activities such as laundry and housework while she was

working.  Ziegler advised Pletsch "to find time to do her daily living activities even *if this means that she will have to cut back on her employment hours*."  (Tr. 428) (emphasis added).  And, in the observation part of her notes, Ziegler stated the following:

> Towards the end of the hour session, Elaine, was having difficulty expressing herself. She would forget words and then become upset with herself because she was unable to concentrate and remember.  She was seen at 1:00 p.m.-2:00 p.m.  She had already put in four hours at Head Start this morning.

(Tr. 428).  Ziegler then expressed concern that Pletsch may be pushing herself too hard and expecting too much and requested that she undergo a current psychological assessment to see if she had made any gains in her mental functioning and emotional health.   (Tr. 428).

Pursuant to the referral made by Ziegler, Pletsch underwent a psychological evaluation by Dr. Renee Boomgaarden, a clinical psychologist at BHSC, which included testing.  In a seven-page report, Dr. Boomgaarden noted that the reason for the referral was Ziegler's concerns that Pletsch may be pushing herself too hard by working 20 hours per week and Ziegler's observations of Pletsch's fatigue and difficulty in expressing herself.  (Tr. 343).  Consequently, Dr. Boomgaarden tested Pletsch twice, once before work and once after she worked a four-hour shift.

In her report, Dr. Boomgaarden stated that she visually observed Pletsch to be more fatigued in the afternoon session after she had completed work and that her test results reflected a decrease in performance.  (Tr. 345, 348).  She stated that the testing revealed that Pletsch "was a woman with compromised attention and concentration skills who is not able to pay sufficient attention to the environment around her in a manner that would maximize her functional capacities" and that she needs "an environment relatively stress-free to cope, and that her ability to handle stress is impaired by her physical problems." (Tr. 348).  She then went on to state:

There was no indication of depression or somatization in the personality testing. Elaine seems to perceive herself as physically damaged and vulnerable. There was no suggestion, however, that she was channeling emotional problems into physical symptoms. Elaine appears to be a person who would thrive in an a [sic] work environment where precision is valued and where the rules for work and decision making are clear and uncomplicated. She will use intellectualization as a defense mechanism. This is certainly not unusual for someone as bright as she. She will need an environment relatively stress-free to cope. Her ability to handle stress will be impaired due to her physical problems.

The fact that Elaine is working 20 hours per week is probably only possible given the environment in which she lives. There are fewer places to go, fewer reasons to drive, and far less stimulation in Killdeer, North Dakota compared to Portland, Oregon. I doubt that Elaine would be functioning as well as she is now if she were in an urban area. Elaine appears to be making a slow recovery from her chronic fatigue problems. She continues to have problems with attention and concentration, and her ability to function will continue to wax and wane, dependent upon her physical assertion, and her Chronic Fatigue Immune Dsyfunction Syndrome symptoms. I do not believe that she is capable of sustaining full-time competitive employment. I do not believe she is malingering. She appears to be making a concerted effort to strengthen herself for work and this will need to continue for the indefinite future. Elaine need to continue maintaining and enriching her sobriety experiences.

(Tr. 349). Overall, Dr. Boomgaarden's diagnostic impressions were: Axis I - cognitive disorder not otherwise specified for attentions, concentration, and mental control with polysubstance dependent (primarily alcohol and cannabis) in remission since 1994; Axis II - obsessive compulsive personality features; Axis III - chronic fatigue syndrome since 1997, seasonal allergies and history of psoriasis; Axis IV - psychosocial and environmental problems: inability to work and financial stress; and Axis V - global assessment functioning scale: 60. (Tr. 349).

After working for Head Start from April 2001 to September 2001, Pletsch next worked part-time for a local county newspaper for less than a month. Following that, she has been self-employed, working part-time troubleshooting computer software and operating system issues for personal computer users in the area  earning minimal amounts of money.

The record contains a letter from the editor of the Dunn County Herald stating that Pletsch had been hired to work about 20 hours per week, but was unable to work them consistently on a schedule that would meet their requirements.  In particular, the editor reported that Pletsch "became fatigued after only two hours" and sometimes had to leave early and  leave her work unfinished. (Tr. 81).  There also is an e-mail response, purportedly by the director of the Head Start program, stating that she observed Pletsch "was unable to complete the expected work even at the beginning of the day" and that "[t]oward the end of your employment, that was more frequent, 2 to 3 days per week."  (Tr. 82).[1]

In addition treatment notes from therapist Ziegler which have been discussed above, the record also contains a letter from her dated September 29, 2003, which summarizes what Ziegler purports to have observed during her therapy sessions with Pletsch from December 6, 2000, to May 15, 2003, when Ziegler left BHSC to work as the clinical director at the North Dakota women's prison, along with her recommendations.  The letter reads as follows:

September 29, 2003

To Whom it May Concern:

This information is based upon therapy sessions held while I was Elaine Pletsch's counselor from December 6, 2000 to May 15, 2003, when I left Badlands Human Service Center.

Elaine usually accepts and operates well within the limits imposed by her Chronic Fatigue Syndrome (CFS), but she has problems whenever she attempts to work more than she is able, or tries to meet her own or other peoples' expectations regarding employment or socialization.  Then she pushes herself too much and often for too long, with the result that she becomes very frustrated with her illness.  I have found

---

[1]  As discussed later, one of the exhibits that Pletsch may have submitted to, and was rejected by, the Appeals Council was a letter from the director of the Head Start program.  While providing slightly more detail, the letter is cumulative of the information in the e-mail response, and there is nothing in the ALJ's opinion stating that the e-mail response was insufficient or not credible.

her to be willing to take suggestions for coping with her CFS, but she sometimes struggles with accepting the limitations imposed by her illness and expects too much from herself.

Elaine has clearly demonstrated an inability to work even half time.  In 2001, she attempted to work 20 hours per week.  Only three weeks into the attempt, she reported making major mistakes at work but "feels her boss is very understanding." At this appointment after work, she had difficulty expressing herself and was unable to concentrate and remember.  I suggested that she reduce her work hours, because she was only able to function at the job by ignoring her daily living tasks.  Before following through on my suggestion three months later, she reported being irritable at work and yelling at her cats, yet Elaine said she felt very positive about herself emotionally for being able to put in that amount of time working.

Many times when I have seen Elaine, she was fatigued for no apparent reason, even at 9:00 a.m.  Other times she was obviously fatigued during the appointment. Regardless of whether or not she was fatigued, she sometimes had problems verbalizing or remembering what she wanted to say.  These symptoms became worse when she was fatigued.  It seems she often cannot predict what activities cause fatigue.  On some days she is able to accomplish several tasks with no apparent effect, as long as she takes adequate rest breaks.  On other occasions, she becomes fatigued trying to do just a fraction of the same tasks.  She had noticed that when she pushes herself and overdoes for a period of time, she requires twice that amount of time to recuperate.

Elaine displays a strong desire to work.  When she is not employed and feels able to work, she is looking for a job.  She is frustrated at the lack of employment opportunities in Killdeer and says it was actually easier to find a 3-hour a week job in Portland.  Because of this, last year she started a computer consulting business out of her home.  This also proved to be too much for her, since she couldn't control her work hours.

Since Elaine has stated that she usually has only one to three hours of energy in the morning and can't count on having any energy remaining in the afternoon, it will be very difficult for her to find employment.  I fee [sic] she shouldn't try to work more than 1-3 hours a day, one or two days a week with a flexible schedule.  This will allow her to work and still accomplish her daily living tasks within her limited capacity.  This recommendation is made only because it seems to be very important to Elaine to be employed.  I would recommend and have recommended to Elaine that she not continue to seek employment but rather she concentrated on caring for herself and performing her daily living activities.

If you have any further questions, you may contact me at 701-456-7790.  Thank-you for considering this information while determining Elaine's status.

11

Sincerely

Claudia Ziegler, MSED, MAC, LSW, LAC
Clinical Director
Dakota Women's Correctional Rehab Center
44 McKenzie Drive
New England, ND 58647

(Tr. 317).

Finally, the record also contains information submitted by Pletsch's mother detailing Pletsch's fatigue and lack of energy, difficulty completing tasks, and the fact that Pletsch appears unable to do much on a daily basis because of her lack of energy. (Tr. 167-175).

### 5.      Treatment and observations by Dr. Wolf

As already noted,  Pletsch began seeing Dr. Wolf in January 2001, and she continued to see him on a regular basis throughout the period relevant to her claim.  (Tr. 358-400, 431-442).  After his first visit with her, Dr. Wolf noted the following as his impressions:

> She has a large number of symptoms which could be due to chronic fatigue, but may also be psychosomatic.  Most people with chronic fatigue have a psychological affect to their illness.  If not caused by the illness, may be a factor in causing it.  All the facts are not in yet.

(Tr. 398).

Thereafter, other than the nurses taking Pletsch's blood pressure and pulse, a number of the visits with Dr. Wolf involved a discussion of Pletsch's subjective complaints and completing reports for Pletsch's private disability carrier.  Periodically, but not on every visit, Dr. Wolf conducted a physical examination and, occasionally, lab tests were run.  Notably, during almost all of the time that Pletsch saw Wolf, neither he nor his nursing staff recorded any temperatures, assuming they were even taken.  The significance of this will be addressed later.

12

For the most part, the visits and the examinations revealed little in the form of objective symptoms. On one occasion, Dr. Wolf noted a positive CMV that he believed might be indicative of an infection, which he noted could be a cause of chronic fatigue. (Tr. 368, 371). Also, on another occasion, he noted that Pletsch appeared tired although not depressed (Tr. 393), but there is some indication he did not include in his notes every time she appeared to be tired. This is because, when Pletsch became concerned whether Dr. Wolf was making an adequate record of his subjective and objective findings, he noted in his record that he did not put everything in his chart, in part, because of the chronology that Pletsch was keeping and presenting to him with respect to her self-reported symptoms. (Tr. 372). Finally, in connection with a physical examination on June 26, 2004, Dr. Wolf did note that Pletsch "looks and seems better." (Tr. 361).

During the visits with Dr. Wolf, Pletsch presented him with the latest charts that she was keeping documenting her symptoms. At one point, Dr. Wolf referred to the chart as an hour-by-hour account (Tr. 365), but at other places he refers to it as a daily account. (Tr. 367, 376,). The charts as completed by Pletsch are an exhibit in the record and they clearly are a daily summary and not an hour-by-hour account. (Tr. 193-301) This point will be addressed in more detail later.

Occasionally, Dr. Wolf tried different prescription medications, including Ritalin, Valtrex, and Klonopin, with limited success according to Pletsch, Dr. Wolf's notes, and his RFC determination. (Tr. 384, 391, 392-393, 436). Pletsch reported that the Ritalin, which is a stimulant, was helpful to some extent when she need a little extra boost to stay awake while driving or when she absolutely needed to accomplish a particular task. (Tr. 382). The Valtrex, which was prescribed to treat any underlying infection that might be causative of the chronic fatigue, did not appear to

13

help.  (Tr. 368, 436). The Klonopin was prescribed to provide calming in terms of her RLS and to assist her in falling asleep.  (Tr. 364, 441).

Dr. Wolf's ultimate diagnosis after months of trying various drugs and ruling out other causes for her chronic fatigue, including depression, narcolepsy, fibromyalgia, thyroid, and a virus, was that Pletsch was suffering from CFS and at times from associated depression.  (Tr. 376, 436).

Dr. Wolf completed a residual functional capacity questionnaire on October 13, 2004. (Tr. 431-37).  In his report, he assessed Pletsch's work tolerance as "incapable of even a low stress job." (Tr. 433).  He reported Pletsch had difficulty with attention and concentration, especially when she is tired. (Tr. 436).  He noted she had problems doing mental tasks at a part-time job and working twenty hours per week resulted in a marked aggravation of her symptoms. (Tr. 436-37).  He also noted the similar diagnoses made in Oregon and the psychological testing performed by Dr. Boomgaarden.  Unlike the non-examining state-agency physicians, he gave a much more detailed narrative explaining his opinions.  (Tr. 436-437).  In making his report, he had not, however, reviewed the FCE performed in November 2003, but stated he believed Pletsch was incapable of working an eight-hour day.  (Tr. 437).

### 6.    Functional capacity assessment performed in November 2003

Pletsch underwent a two-day functional capacity evaluation on November 12 and 13, 2003. (Tr. 318).  The occupational therapist, Jared Erie, found Pletsch showed significant abilities with regard to sitting, gripping, and upper extremity coordination. (Tr. 321).  He determined that Pletsch could lift objects for one-half hour per eight-hour workday, sit for one-half to one hour at a time before changing position, keyboard for a minimum of one hour at a time, and perform the demands of her past work as a technical writer as it is generally performed.  (Tr. 319-21).  Mr. Erie noted,

however, that his testing did not take into account any mental and emotional fatigue that may be suffered by Pletsch from time-to-time as a result of CFS.  He stated that his conclusion that Pletsch was capable of  light sedentary work was based on an extrapolation of his two-day testing of her physical abilities to the time period required for full-time work, and that a determination needed to be made whether any emotional and mental fatigue suffered by Pletsch would allow her to maintain such employment.  (Tr. 318-330).

### 7.      Conclusions of non-examining state-agency consultants

In August 2004, a state-agency physician reviewed Pletsch's medical records and completed a physical functional capacity assessment based on a paper review of the records, although as discussed later it is impossible to tell what records he reviewed, particularly given the limited handwritten comments that he made.  (Tr. 406-413).   The state-agency physician found that Pletsch had the physical residual functional capacity to lift twenty pounds occasionally and ten pounds frequently; stand/walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; engage in unlimited pushing and pulling; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 406-13).  A second state agency physician purportedly reviewed the file and affirmed the assessment on December 29, 2004, without making any separate comments of his own. (Tr. 413).

Also in August 2004, a state agency psychologist reviewed the medical records. (Tr. 414-27). He found Pletsch had a non-severe affective disorder (depression) which produced no restriction of activities of daily living; mild difficulties in social functioning, mild difficulties in concentration, persistence and pace, and no episodes of decompensation. (Tr. 414-24).  A second state-agency

psychologist reviewed the file and affirmed the assessment on December 30, 2004. (Tr. 414). Again, it cannot be determined from these reports what records were actually reviewed.

### D.    Other Evidence

The record contains Pletsch's logs charting her physical and mental symptoms on a daily basis (Tr. 193-301), as well as numerous forms and statements completed by Pletsch which cover her symptoms, work history, activities, and medications. (Tr. 83-192).

### E.    Administrative Hearing Testimony

The ALJ convened an administrative hearing on March 29, 2006.  (Tr. 445).  Pletsch appeared personally with her attorney and gave testimony.  (Tr. 445-486).  In addition, the ALJ called vocational expert, Dr. Warren Haagenson, as a witness.  (Tr. 445, 486-92).

Pletsch  testified she was 43 years of age, divorced, and living in Killdeer, North Dakota. (Tr. 447).  She has no children and lives in her mother's basement.  (Tr. 448).  She is 5' 6" and currently weighed about 200 pounds.  (Tr. 449).  She dropped out of high school during her senior year but later obtained a GED and went to college for two years, where she studied software engineering. (Tr. 450).  She served in the United States Air Force from March 1980 through January 1982.  (Tr. 451).

Pletsch testified she has an in-home business helping people with computer software problems.  (Tr. 453).  She currently devotes about two hours per week to the business.  (Tr. 453). The last time she held a full-time job was 1997, when she worked as a technical writer in Oregon. (Tr. 454).  She was on medical leave when her position was terminated.  (Tr. 454).  She received private disability benefits from December 1999, until February 2006, in the amount of $1,771.09

per month.  (Tr. 455).  Fatigue was reported as the primary reason she could not return to full-time work.  (Tr. 457).

Pletsch testified she was diagnosed with chronic fatigue syndrome in 1998. (Tr. 458).  Her symptoms included low-grade fever, sore throat, joint pain, muscle ache, tender lymph nodes, numbness in the hands and feet, food allergies, sensitivity to personal care products, sensitivity to noise and light, and fatigue.  (Tr. 458-59).  She naps 1-2 hours per day and sleeps 9-10 hours per night.  (Tr. 460).  She reports having 2-3 bad days per month and 2-3 good days with the rest being just okay.  (Tr. 466, 482).  She spends about an hour a day on the computer. (Tr. 472).  She spends several hours per day reading and also may watch some TV.  (Tr. 475).  She is able to take care of her personal needs, cook meals that largely involve heating frozen dinners, make her bed, wash dishes and clothes, and shop for groceries.  (Tr. 476-77).  On a bad day she is not able to do much of anything.  (Tr. 477-78).  She is able to drive a car.  (Tr. 479).  On a good day she can walk a mile and on a bad day she can only walk 25-50 feet.  (Tr. 480).  She reports traveling 35 miles to Dickinson once a month to shop, but also reported that this level of activity wiped her out for a day or two afterward.  (Tr. 484).

The vocational expert testified that Pletsch's past relevant work fell in the sedentary category. (Tr. 487).  The ALJ asked the vocational expert whether a person with the same vocational profile as Pletsch and who is able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand or walk with normal breaks for a total of two hours in an eight-hour day, sit with normal breaks for a total of six hours in an eight-hour day, and climb, balance, stoop, kneel, crouch, and crawl on an occasional basis could perform Pletsch's past work.  (Tr. 488).  The vocational expert testified such a person could perform Pletsch's past relevant work and the full range of

17

sedentary work. (Tr. 488). A hypothetical person who had the same limitations but could only lift ten pounds occasionally and ten pounds frequently would be able to perform all of Pletsch's past relevant work, except that of technical writer as Pletsch described it, along with the full range of sedentary work. (Tr. 488-89). If the hypothetical person were further limited to a need to alternate between sitting and standing every 30 minutes, then that person would not be able to perform Pletsch's past work but could perform numerous unskilled sedentary jobs such as beverage order clerk, charge account clerk, or sedentary assembly type jobs. (Tr. 490). These jobs could still be performed if limitations with regard to difficulty concentrating, understanding, remembering, and carrying out short simple instructions were added to the list of limitations. (Tr. 491). If Pletsch's testimony was accepted in its entirety, she would not be capable of working the required amount of time on a competitive basis. (Tr. 491-92).

**F.     ALJ's Decision**

The ALJ issued his written opinion denying Pletsch's application for disability insurance benefits on May 22, 2006. (Tr. 17-26). When reviewing the application, the ALJ employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. He quickly dispensed with the first step, acknowledging that Pletsch had not engaged in substantial gainful activity since her alleged onset date, May 8, 2001. (Tr. 19).

At the second step, the ALJ inquired into whether Pletsch had a severe impairment. The ALJ concluded that Pletsch's CFS and RLS were severe impairments. (Tr. 20). The ALJ determined both afflictions more than minimally limited Pletsch's ability to perform basic work-related activities on a durational basis. (Tr. 20). The ALJ found Pletsch had also been treated for depression but there had been no in-patient treatment, hospitalization, or episodes of

decompensation.  (Tr. 21).  Consequently, the ALJ determined the depression was not a severe impairment.  (Tr. 21).

Moving on to the third step of his analysis, the ALJ compared Pletsch's impairment to the presumptively disabling impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 21). He determined that Pletsch did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments as the record did not document such a loss of function.  (Tr. 21).  He noted chronic fatigue syndrome is not a listed impairment, her aches and pain were intermittent, and that an inability to stand, walk, or sit was not alleged.  (Tr. 21).  He further noted that Pletsch retained the ability to drive a car, walk without assistance, and use a telephone, computer, Internet, and printer.  (Tr. 21).

At the fourth step of his analysis, the ALJ assessed Pletsch's residual functional capacity, that is, her ability to do sustained work-related physical and mental activities in a work setting on a regular basis.  He found that Pletsch's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  (Tr. 23).  However, he also concluded that Pletsch's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  (Tr. 23).  In doing so, the ALJ noted the severity of the claimant's allegations was not supported by objective laboratory or clinical findings.  (Tr. 23).  Supporting this conclusion was also the absence of pain medication and her broad range of daily activities.  (Tr. 23).

The ALJ also noted that Pletsch has had little incentive to work since 1999 when she began receiving private disability payments.  (Tr. 23).  Another factor noted was the volume of material Pletsch presented to her doctors regarding her condition and the amount of time and energy necessary to conduct such research.  (Tr. 24).  In addition, Pletsch was able to read for several hours

a day on the average and complete a daily journal of her symptoms. (Tr. 24). The ALJ noted his assessment of Pletsch's residual functional capacity was generally consistent with the determinations of the state agency consultants and the 2003 functional capacity evaluation. (Tr. 24).

The functional capacity questionnaire completed by Pletsch's treating physician was afforded minimal weight. (Tr. 25). The ALJ explained the treating physician's comments were inconsistent with his own treatment notes. (Tr. 25).

Based upon his review of the evidence, the ALJ determined that Pletsch's residual functional capacity was as follows:

> [T]hrough the last date insured, the claimant had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull (including operation of hand and/or foot controls) on an unlimited basis, other than as shown for lift and/or carry; occasionally climb ramp/stairs/ladder/rope/scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.

(Tr. 21-22). He further determined that, given this residual functional capacity, Pletsch was capable of performing a range of work requiring light exertion. (Tr. 25).

At the fifth step, the ALJ determined that Pletsch was capable of performing her past relevant work as a technical writer, technical support person, and data entry clerk. (Tr. 26). These jobs fell within the sedentary to light exertional work activity level and thus were consistent with residual functional capacity established in step four. (Tr. 25). Consequently, he concluded that Pletsch was not disabled as defined in the Social Security Act at any time prior to and through June 30, 2004, the last date Pletsch was insured. (Tr. 26).

**G.     Additional Evidence Submitted to the Appeals Council**

Pletsch submitted additional evidence to the Appeals Council in support of her request for review. This additional evidence does not appear in the administrative record. The Appeals Council referenced the additional records in its denial of Pletsch's request for review and found the records did not pertain to the relevant time period. (Tr. 5-6). The relevant time period is prior to June 30, 2004, the date Pletsch was last insured for DIB benefits. The Appeals Council described the records as "the 2006 and 2007, records from Dennis E. Wolf, MD, Great Plains Clinic, and the Standard insurance company."

Pletsch has submitted additional records as exhibits in support of her motion for summary judgment which she refers to as the records submitted to the Appeals Council. These records are as follows:

1. Records from Great Plains Clinic (Dr. Wolf) dated February 23, 2006, to October 11, 2007.
2. A letter from Dr. Wolf dated November 25, 2007.
3. A letter from Pletsch's Head Start employer Sharon Hansen dated July 6, 2006.
4. A Functional Capacity Evaluation dated March 14, 2006.

## II.   LEGAL DISCUSSION

### A.   Standard of Review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review. Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

### B.    Law Governing Eligibility for Adult Benefits

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental

impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence,

including, particularly, any observations of treating physicians and the claimant's own subjective

complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's

credibility in light of the objective medical evidence and "any evidence relating to: a claimant's

daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication;

precipitating and aggravating factors, and functional restrictions." Id.   In this circuit, these are

referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d

1320 (8th Cir. 1984).[2] E.g., Ellis v. Barnhart, 392 F.3d at 993-996.  Claimant's subjective complaints

may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v.

Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that

are supported by accepted diagnostic techniques and that are not inconsistent with other substantial

evidence.  This rule does not apply, however, to opinions regarding disability or inability to work

---

[2]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> > 1. the claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain;
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication; and
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

because these determinations are within the exclusive province of the Commissioner.  The Eighth

Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>
> . . . .
>
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon

the Commissioner.  The Commissioner is charged with making his own disability determination

based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v.

Chater, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden

shifts to the Commissioner to prove that there are other jobs in the national economy that the

claimant can perform.  Pearsall v. Massanari, 274 F.3d at 1217.

## III.    ANALYSIS AND DISCUSSION

### A.    Introduction

The ALJ concluded that Pletsch was suffering from CFS and RLS, that her impairments were severe, and that her impairments could reasonably be expected to produce the symptoms she reported. (Tr. 20). Nevertheless, he concluded the symptoms were not severe enough to prevent Pletsch from performing light or sedentary work of the kind that she had performed in the past.

Pletsch disagrees with this assessment. Pletsch contends that she was a high-energy person who worked for almost ten years before being stricken with CFS. She contends that after being stricken with CFS she suffers from low energy and fatigue. She states, that while there are some days when she can do more than others, there are at least several days each month she is not capable of doing much of anything. Pletsch argues she was incapable of working at the level determined by the ALJ - particularly on a consistent basis.

In a nutshell, the primary issues for the ALJ were: (1) whether Pletsch was capable of working something approximating full days, even at a sedentary job that did not require a lot of concentration; and (2) whether she was capable of doing this consistently enough to remain employed in a competitive environment. As to the later, the vocational expert testified that Pletsch would not be reliable enough to maintain competitive employment if she had two or more "bad days" a month as a result of her chronic fatigue as she claimed. (Tr. 491-492).

The Commissioner acknowledges in his brief that the ALJ failed to address certain record evidence favorable to Pletsch with respect to these issues, but argues that these errors can be overlooked for reasons that will be addressed in more detail below. The question then becomes whether these failures are significant enough, either individually or in combination, to require remand. Also, in addition to the evidence not considered by the Commissioner, there are other concerns with respect to the ALJ's opinion.

Before turning to the specific issues, some discussion regarding CFS, the significance of psychological testing, the importance of considering the longitudinal clinical record, and the particular importance of credibility determinations in CFS cases is in order.

### B.    Social Security Ruling 99-2p

Social Security Ruling 99-2p governs the evaluation of cases  involving CFS.   It defines CFS as follows:

> CFS is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity. It is characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities. In accordance with criteria established by the CDC, a physician should make a diagnosis of CFS "only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded" (Annals of Internal Medicine, 121:953-9, 1994). CFS has been diagnosed in children, particularly adolescents, as well as in adults.

> Under the CDC definition, the hallmark of CFS is the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities. Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:

>> Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;

>> Sore throat;

>> Tender cervical or axillary lymph nodes;

>> Muscle pain;

>> Multi-joint pain without joint swelling or redness;

>> Headaches of a new type, pattern, or severity;

Unrefreshing sleep; and

Postexertional malaise lasting more than 24 hours.

Within these parameters, an individual with CFS can also exhibit a wide range of other manifestations, such as muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety).

SSR 99-2p, 1999 WL 271569, *1-2 (1999).

As noted by this definition, chronic fatigue often has a mental component, including such symptoms as memory and concentration problems, difficulty in comprehending and processing information, depression, irritability, and anxiety. In fact, SSR 99-2p provides that mental impairments determined by psychological testing can constitute medical or laboratory findings of a medically determinable impairment. And, "[t]he severity of an individual's impairment(s) is determined based on the totality of medical signs, symptoms, and laboratory findings, and the effects of the impairment(s), including any related symptoms, on the individual's ability to function." SSR 99-2p, 1999 WL 271569, *4. By definition then, this includes psychological testing.

SSR 99-2p emphasizes that CFS is particularly difficult to diagnosis and that often the diagnosis is made only by eliminating other possibilities for the individual's symptoms. In fact. SSR 99-2p notes "that standard laboratory test results in the normal range are characteristic for many individuals with CFS, and should not be relied upon to the exclusion of all other clinical evidence in decisions regarding the presence and severity of a medically determinable impairment." 1999 WL 271569, *3 n.4.

And in evaluating the available evidence, SSR 99-2p stresses the importance of considering the longitudinal clinical record given that the medical signs and symptoms of CFS can fluctuate in frequency and severity over many months or years.  The ruling states:

> The medical signs and symptoms of CFS fluctuate in frequency and severity and often continue over a period of many months or years. Thus, appropriate documentation should include a longitudinal clinical record of at *least* 12 months prior to the date of application, unless the alleged onset of CFS occurred less than 12 months in the past, or unless a fully favorable determination or decision can be made without additional documentation. The record should contain detailed medical observations, treatment, the individual's response to treatment, and a detailed description of how the impairment limits the individual's ability to function over time.
>
> * * * *
>
> As with all claims for disability under both title II and title XVI, documentation of medical signs or laboratory findings in cases involving CFS is critical to establishing the presence of a medically determinable impairment. In cases in which CFS is alleged, longitudinal clinical records reflecting ongoing medical evaluation and treatment from the individual's medical sources, especially treating sources, are extremely helpful in documenting the presence of any medical signs or laboratory findings, as well as the individual's functional status over time. Every reasonable effort should be made to secure all available, relevant evidence in cases involving CFS to ensure appropriate and thorough evaluation.

SSR 99-2p, 1999 WL 271569, *5-6 (emphasis added).

SSR 99-2p also notes that conflicts in the medical evidence are often quite common given the nature of the disease and provides the following instructions in terms of resolving conflicts:

> It should be noted that conflicting evidence in the medical record is not unusual in cases of CFS due to the complicated diagnostic process involved in these cases. Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources.

1999 WL 271569, *7

Finally, SSR 99-2p provides guidance in terms of assessing credibility and states the following:

29

Assessing Credibility. In accordance with SSR 96-7p, if the existence of a medically determinable impairment that could reasonably be expected to produce the symptoms has been established, as outlined above, but an individual's statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. The adjudicator must then make a finding on the credibility of the individual's statements about symptoms and their functional effects. When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements.

Treating and other medical sources. In evaluating credibility, the adjudicator should ask the treating or other medical source(s) to provide information about the extent and duration of an individual's impairment(s), including observations and opinions about how well the individual is able to function, the effects of any treatment, including side effects, and how long the impairment(s) is expected to limit the individual's ability to function. Opinions from an individual's medical sources, especially treating sources, concerning the effects of CFS on the individual's ability to function in a sustained manner in performing work activities or in performing activities of daily living are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC. In this regard, any information a medical source is able to provide contrasting the individual's impairment(s) and functional capacities since the alleged onset of CFS with the individual's status prior to the onset of CFS will be helpful in evaluating the individual's impairment(s) and its functional consequences.

Third-party information, including evidence from medical sources who are not acceptable medical sources for the purpose of establishing the existence of a medically determinable impairment, but who have provided services to the individual, may be very useful in deciding the individual's credibility. Information other than an individual's allegations and reports from the individual's treating sources helps to assess an individual's ability to function on a day-to-day basis and to depict the individual's capacities over a period of time. Such evidence includes, but is not limited to:

> Information from neighbors, friends, relatives, or clergy;
>
> Statements from such individuals as past employers, rehabilitation counselors, or school teachers about the individual's impairment(s) and the effects of the impairment(s) on the individual's functioning in the work place, rehabilitation facility, or educational institution;

> Statements from other practitioners with knowledge of the individual, e.g.,
> nurse-practitioners, physicians' assistants, naturopaths, therapists, social
> workers, and chiropractors;
>
> Statements from other sources with knowledge of the individual's ability to
> function in daily activities; and
>
> The individual's own record (such as a diary, journal, or notes) of his or her
> own impairment(s) and its impact on function over time.

The adjudicator should carefully consider this information when making findings
about the credibility of the individual's allegations regarding functional limitations
or restrictions.

1999 WL 271569, *7-8.

### C. The ALJ's failure to address evidence favorable to the claimant with respect to whether she was capable of working competitively at the determined functional capacity

#### 1. Therapist Ziegler and Dr. Boomgaarden

The Commissioner acknowledges in his brief that the ALJ failed to address the observations and opinions of Pletsch's therapist, Claudia Ziegler, as well as the testing and conclusions of Dr. Renee Boomgaarden, a clinical psychologist at the Badlands Human Service Center.[3] The evidence relating to both therapist Ziegler and Dr. Boomgaarden has been set forth above in some detail.

The Commissioner characterizes the Ziegler and Dr. Boomgaarden evidence as limited to the expression of opinions regarding Pletsch's inability to work. He argues that, "while the failure to address [these] two opinions might alter the outcome of a different case," the errors here were harmless because the work limitations imposed by Ziegler and Dr. Boomgaarden were essentially the same as imposed by Dr. Wolf, which the ALJ expressly discounted. The Commissioner also

---

[3] Actually, while not addressing Dr. Boomgaarden by name, the ALJ does make a brief reference to her test results in concluding that Pletsch was suffering from a medically determinable impairment. (Tr. 20). The Commissioner is accurate, however, in stating that the Dr. Boomgaarden evidence was not further discussed in assessing Pletsch's credibility, the relative severity of her impairments, and the consistency of her evidence with the observations and opinions of treating physician Dr. Wolf, which the ALJ discounts.

31

argues that Ziegler's and Dr. Boomgaarden's opinions regarding Pletsch's inability to work were not entitled to significant weight in any event because the determination of whether she was capable of working was a determination reserved to the Commissioner.

The problem with these arguments, however, is that the Ziegler and Dr. Boomgaarden evidence was not limited to mere expressions regarding Pletsch's inability to work. Further, their observations and opinions regarding Pletsch's ability to work were not confined to the ultimate issues reserved to the Commissioner.

Therapist Ziegler (who was a state employee working for the Department of Human Services) noted both in her letter and in her contemporaneous treatment notes that she personally observed Ziegler's fatigue and difficulties with concentration and formulating her words, all of which are symptoms of CFS.  In fact, Ziegler was so concerned about what she observed that she requested an evaluation by Dr. Boomgaarden.  By any measure, these were "objective" findings made by a medical source.

Similarly, with respect to Dr. Boomgaarden, the Commissioner ignores that she conducted a full psychological evaluation, which included testing both before and after Pletsch had worked a four-hour shift, and that Dr. Boomgaarden visually observed Pletsch to be  fatigued following the second test and that the test results showed a decrease in performance.  Dr. Boomgaarden's interpretation of the test results was that Pletsch was suffering from mental impairments, including problems with handling stress, and that her symptoms were not caused by depression, somatization, or malingering.  At least some of these findings constitute objective medical or laboratory evidence of a medically determinable impairment under  SSR 99-2p.

In short, the Ziegler and Dr. Boomgaarden evidence was not confined to mere expressions of opinions as to an inability to work.  Rather, the evidence included objective findings and

observations relevant to the severity of Pletsch's CFS that the ALJ claimed were lacking when he discounted both Dr. Wolf's opinions and Pletsch's statements with respect to the impact that Pletsch's chronic fatigue had on her ability to work full-time on a sustained basis.

The Ziegler and Dr. Boomgaarden evidence was also relevant in other respects. For example, in noting his reasons for discounting Pletsch's statements concerning the limiting effects of her symptoms, the ALJ stated, "[t]he undersigned notes that claimant had little incentive to even attempt work until the last few months" because of the private disability payments, which stopped just prior to the ALJ hearing. But if this is relevant, then so also would be the recommendation by therapist Ziegler that Pletsch cut back on her part-time work efforts because of her that it was taking too much of a toll on Pletsch. The same is true with for the opinions of Dr. Boomgaarden about the limited work she thought that Pletsch could handle.

Finally with respect to his alternative argument, the Commissioner cites cases holding that opinions by medical sources that an individual is disabled and entitled to benefits need not be accorded the weight normally given to medical opinions because these determinations are reserved to the Commissioner as a matter of law. However, in citing these cases, the Commissioner fails to note that by his own policies such opinions should still be considered. SSR 96-8P, n.8, 1996 WL 374148. But, more importantly, the opinions of Ziegler and Dr. Boomgaarden did not all go to the ultimate issues reserved to the Commissioner. See Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996). For example, Ziegler recommended to Pletsch that she cut back on her part-time hours, and Dr. Boomgaarden gave the reasons why she believed the part-time work Pletsch was doing in a low-stress environment was all she could handle. These were observations and opinions from medical sources that SSR 99-2p states are particularly relevant in CFS cases. The following was previously quoted, but it bears repeating in this context:

33

> Opinions from an individual's medical sources, especially treating sources, concerning the effects of CFS on the individual's ability to function in a sustained manner in performing work activities or in performing activities of daily living are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC.

SSR 99-2p, 1999 WL 271569, *7.

In summary, the arguments advanced by the Commissioner that the ALJ need not have addressed the Ziegler and Dr. Boomgaarden evidence in terms of Pletsch's credibility, the severity of her alleged impairments, and the consistency of their opinions and observations with those of treating physician Wolf and others are not convincing.

### 2.   Employer and co-worker evidence

The ALJ's opinion is also devoid of *any* discussion of the employer and co-worker evidence, all of which was favorable to Pletsch with respect to the impact that her CFS had on her ability to work on a sustained basis.  This evidence included statements made by the employers she worked for on a part-time basis in North Dakota and co-workers from when she worked in Oregon.   While the ALJ did mention the observations of Pletsch's mother, he limited his recitation of her mother's observations to those that were the most innocuous.

SSR 99-2p instructs that the ALJ should carefully consider third-party information when making findings about the credibility of the individual's allegations regarding functional limitations or restrictions.  1999 WL 271569, *7-8.  There is no indication the ALJ did so in this case, except to the limited extent of Pletsch's mother.

### 3.   Longitudinal medical evidence

The Commissioner cites Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006), as authority for the proposition that "[e]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be awarded."  In fact, in CFS cases,

longitudinal evidence is particularly relevant because "the medical signs and symptoms of CFS fluctuate in frequency and severity and often continue over a period of many months or years." SSR 99-2p, 1999 WL 271569, *5.

In this case, there is substantial longitudinal evidence that was not discussed by the ALJ, including: the opinions of Pletsch's Oregon treating physician that she was suffering from CFS and was capable of working only part-time; the opinions of a clinical psychologist in Oregon who reached essentially the same conclusions as Dr. Boomgaarden after having conducted a full-scale psychological evaluation of Pletsch; and the evidence from co-workers in Oregon who professed to have seen Pletsch struggle even when attempting to only work part-time.

For example, the clinical psychologist in Oregon reported, in part, the following after her 1999 evaluation:

> However, subtle but important difficulties were represented in fluctuations of attention, concentration, distractibility, problems with mental control and some variability within her memory functioning. She had considerable difficulty with fatigability as the assessment progressed. It appeared to take a great deal of effort to maintain her level of concentration and to perform at the excellent level that she did. She was exhausted at the end of the 3 and ½ hour session. Overall, she had difficulties with word finding and naming and at times this adversely affected her verbal fluency.
>
> * * * *
>
> Overall, Elaine is a woman with an excellent level of intelligence who has many cognitive strengths. However, she also has some significant limitations as a result of the symptoms of Chronic Fatigue Syndrome. Primary among these is her reported difficulty sustaining physical or mental work with the concentration needed for any significant length of time. Her work period can only consist of approximately 90 minutes a day after which she requires a long rest or nap period. Even then she may not recover her energy. Indeed, it was noted on this exam that she became quite pale and significantly more fatigued as the exam progressed. *As a result, I believe that until such symptoms are significantly reduced she will be unable to be competitively employable.*

(Tr. 308-310) (emphasis in the original).

The relevance of the Oregon evidence is obvious given its consistency with the observations and opinions of Ziegler, Dr. Boomgaarden and Pletsch's part-time employers in North Dakota. In fact, the Oregon evidence was apparently enough to persuade a private disability insurer to pay benefits during most, if not all, of the time period that is the subject of this case.

> **4.      The failure to address the basis for the receipt of the private disability payments, particularly when the ALJ used the receipt of the payments to discount Pletsch's credibility**

As already noted, the ALJ concluded that Pletsch had little motivation to work because of her receipt of private disability payments and gave this as one of his reasons for discounting Pletsch's testimony regarding her inability to work more than part-time. Then, in the same paragraph, the ALJ dismissed the fact she was receiving the payments, stating that disability determinations by others are not binding on the Commissioner. (Tr. 23-24).

While it may be well within the province of the ALJ to consider the impact of the payments on Pletsch's motivation to work, what seems unfair is to not then also address the fact she was receiving the money because someone had determined her to be disabled and the basis for why that determination was made, which here appears to include the Oregon evidence. Cf. Turpin v. Bowen, 813 F.2d 165, 172 (8th Cir. 1987) (while the fact that claimant retired on a disability pension was not binding, it was "entitled to some weight and deserves, at the least, further investigation into how different the standards actually are"); Freese v. Astrue, 2008 WL 1777722, *2 (M.D. Fla. 2008) ("Regulations plainly state that a claimant may bring evidence of an impairment to the Commissioner's attention including '[d]ecisions by any governmental or nongovernmental agency about whether [an individual is] disabled ....' 20 C.F.R. § 404.1512(b)(5).").  Otherwise, for Pletsch,

the fact she had been determined to be disabled and was receiving benefits becomes a "heads-I-win-and-tails-you-lose" argument for the Commissioner.[4]

### 5. Whether the failure to address the evidence favorable to the claimant was harmless

The Commissioner argues that any failure to address evidence favorable to Pletsch was harmless, arguing that there was other substantial evidence favoring the ALJ's decision and that the ALJ would have reached the same conclusions in any event.  The Commissioner also cites to cases holding that mere errors in opinion writing are not sufficient to require remand when there is otherwise substantial evidence favoring the Commissioner's decision.

In this case, however, the foregoing evidence was highly relevant in terms of assessing both Pletsch's credibility, a central issue given the fact that most of her symptoms were subjective, and the weight to be given to Pletsch's treating-physician evidence relative to the other evidence.  Given the closeness of the case, it cannot be that this evidence was simply cumulative and that, if determined to be credible, could not have swung the balance in Pletsch's favor in terms of her credibility, the weight accorded her treating-physician evidence, and ultimately an award of benefits.[5]

------

[4]  In noting that the disability payments created little incentive to work, the ALJ also neglected to discuss the fact that Pletsch made several efforts at part-time work while she was receiving the disability payments and told Dr. Wolf she might try to work more if she determined she was able.

Where the SSA's prior denial of benefits fits with respect to all of this cannot be determined given the lack of any evidence of the particulars of that denial, including the time periods involved and the basis for the denial.  The fact Pletsch was denied benefits previously, however, is not necessarily inconsistent with a determination that by 2001 she had sufficient proof she was disabled by chronic fatigue, given the consistency of some of the evidence from that time frame with the earlier "longitudinal" Oregon evidence, and that the disability was more than temporary.  See SSR 99-2p, 1999 WL 271569.

[5]  Or, to put it another way, assume that the ALJ had found that Pletsch's testimony regarding her limitations, particularly on her "bad days," was credible in light of the visual observations and conclusions of therapist Ziegler, Dr. Boomgaarden, Dr. Wolf, and Pletsch's part-time employers and  the consistency of their observations and opinions with the earlier Oregon medical-source and lay-witness evidence and the determination of the private disability carrier.  Assume further that, based on this evidence,  the ALJ had found that Pletsch was not  capable of working in a competitive environment for a sufficient amount of time, such that she would not be considered disabled,  as of the

The problem here is that it cannot be determined from the ALJ's opinion whether the evidence favorable to Pletsch and not discussed by the ALJ was overlooked, given some weight, or completely disregarded.  See Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008). And, since the failure to address the favorable evidence cannot be considered harmless, remand is required.  See id. (requiring remand when "[s]everal errors and uncertainties in the opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" the claim).

### D.      Other concerns and observations

While the undersigned believes the  forgoing alone requires remand, there are other aspects of the case that are either troubling or where the undersigned would not reach the same conclusions drawn by the ALJ.  At the very least, these points warrant mention if only for the purpose of further illustrating the closeness of the case and why the failure to address the excluded evidence was not harmless.

### 1.      The November 2003 FCE

It is clear from the ALJ's opinion that he placed significant weight on the functional capacity evaluation that was made by an occupational therapist in November 2003.  (Tr. 24-25).  In his opinion, the ALJ characterized the overall results of the evaluation as follows:

> After extensive testing, the specialist opined that claimant is able to perform sedentary to light level work for eight hours per day 40 hours per week.

---

alleged onset date in 2001, and that the single FCE performed by the occupational therapist slightly more than  two years later in late 2003 and the opinions of the state-agency consultants, who had never met Pletsch, were not enough to persuade him differently.  If based on these findings the ALJ  had determined that Pletsch was disabled at least until mid-2003, if not also through the last date of her eligibility in June 2004, could it seriously be argued this would not have been within his  "zone-of-choice"?  See Culbertson v. Shalala, 30 F.3d at 939 (discussing the "zone-of-choice").

The ALJ, however, did not discuss in his opinion the caveat that the therapist included in his report.  In his summary paragraph, the therapist stated:

> In summary, Elaine actively participated throughout the two day Functional Capacity Evaluation.  She showed some significant abilities in ability to set, grip strength, and upper extremity coordination.  In speculating this over time it appears that she would be able to function in some sort of light sedentary type of position.  The question would be how long she would be able to sustain and consistently perform these job duties.  This particular test does not look at the emotional/mental fatigue level that may be associated with the chronic fatigue syndrome and should be taken into consideration when comparing the results.

(Tr. 321).  The significance of this point is obvious given that chronic fatigue often has associated with it mental as well as physical symptoms.

### 2.     The non-examining state-agency physician evidence

The  ALJ stated he gave "great weight" to the opinions of the non-examining state-agency physicians  because they are "familiar with the disability program and its evidentiary requirements, review all documentary medical evidence for a complete picture, and provide a rationale based on objective findings." (Tr. 24).  Also, he used virtually the same language when discussing the weight he accorded the opinions of the non-examining state-agency psychologists.  (Tr. 21).

The use of this formulaic language raises a concern as to whether the ALJ  followed SSA's regulations and Eighth Circuit case law with respect to the weight to be accorded the opinions of the non-examining state-agency consultants.   In the Eighth Circuit, "paper assessments" of residual functional capacity without an actual examination are admissible, but are accorded limited weight, particularly in the face of other more credible evidence.  E.g., Nevland v. Apfel, 204 F.3d 853, 857-858 (8th Cir. 200); Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997).  The SSA's regulations are set forth at  20 C.F.R. § 404.1527.  It may be one thing to accord "great weight" to the opinions of the state-agency consultants in a particular case after having evaluated all of the evidence in

accordance with 20 C.F.R. § 404.1527, but an entirely different thing to accord "great weight" to the opinions of the non-examining state-agency consultants simply on account of their status and without regard to the merits of the other medical evidence.

Another concern with respect to the state-agency physician evidence is the fact that it cannot be determined from the record what medical records and other evidence they reviewed in making their assessments. There is no listing or index in their reports stating what they reviewed. And the printed statement on the face of their reports suggesting that "all evidence in the file" was to be reviewed, including medical records, lay-witness statements, and reports of daily living activities, simply begs the question of what evidence was included in the "file" at the time the assessments were made.[6]

For example, there is no way to determine from the record whether the state-agency physicians considered the longitudinal medical evidence from Oregon, including the opinions of Pletsch's treating physician, her consulting clinical psychologist, and her therapist, as well as the co-worker statements from Pletsch's part-time Oregon employment. The same is true with respect to the North Dakota employer evidence suggesting that Pletsch was having problems working part-time. For not only is there no index of what was considered, there is no mention of this evidence in the state-agency physician assessments.

Finally, it is also worth noting that the state-agency physicians made their determination of Pletsch's residual functional capacity as of June 30, 2004, which was Pletsch's last date of eligibility, and that no opinion was expressed as to her RFC for any earlier time period. This is clear

---

[6] For example, just because a particular medical record or third-party lay witness statement predates the assessment of the state-agency physicians, does not mean the evidence had actually been collected by the SSA as of the date of the state-agency physician assessments, much less that the evidence was actually placed in a file that was made available to them.

from the box that was checked on the first page of their form report (Tr. 406) and the limited scope of the evidence actually commented upon (Tr. 407).   This may be significant in terms of deciding the extent to which their opinions can be used in determining Pletsch's RFC for any earlier period of time.

Under 20 C.F.R. § 404.315(a), Pletsch's last date of eligibility is the not the only date or time period that is relevant.   For example, one possibility may be that Pletsch was disabled on or after the onset date in 2001, but by sometime late 2003 or 2004 her symptoms had temporarily abated or she had improved to the point where she was not disabled.   The fact that persons suffering from CFS can have fluctuating symptoms or can recover altogether are noted as possibilities in SSR 99-2p, 1999 WL 271569, *5-6.

### 3.   Pletsch's daily log of her symptoms and her internet and other researching of CFS

Pletsch kept a daily log of her physical and mental symptoms for much of the period of time that she claims disability.   At least that portion of the log that extends from January 1, 2002, through February 28, 2006,[7] is an exhibit, and it consists essentially of two parts.   (Tr. 193-301).

Most of the pages are a pre-printed chart with each page representing a month's period of time.   Horizontally across the top are printed numbers for the days of the month, *i.e.*, 1, 2, 3, etc. Vertically on the left-hand side of the page are printed categories of information to be completed, including the time Pletsch awoke in the morning, the duration of any naps, the time she went to bed, and whether she exercised on a particular day.   Also, on the vertical scale are pre-printed symptoms opposite which Pletsch rated their intensity using a number scale of 1-5 or no entry if she did not

---

[7]   There are references in the record to Pletsch having submitted diary material to her physicians prior to January 2002.

have that symptom on that day.  She also noted on some of the pages the date when she started certain medications.

The remainder of the log consists of miscellaneous daily notes.  For the most part, these notes are brief, most often one to three sentences long, and there are many days for which no miscellaneous notes are made.  Also, there were two months during which Pletsch monitored her temperatures on a more frequent basis and a single page summarizing the recorded temperatures for this time frame was also included.  (Tr. 295).

It is clear from the ALJ's questioning at the hearing that he was not impressed by the log. (Tr. 462-463).  When asked how much time it took to complete the log on a daily basis, Pletsch said about thirty seconds to fill in the pre-printed chart and about three to five minutes for the miscellaneous notes if she made any on a particular day.  (Tr. 462-463).  While the thirty second estimate may be a little light and a couple of minutes might have been more  accurate, it is apparent from the exhibit, as well as Pletsch's testimony, that the information could be filled out rather quickly.  Also, the ALJ did not inquire how faithful she was doing this on a daily basis and whether there were some days that she completed the information for more than one day.  When asked why she was keeping this diary, Pletsch testified  that her counselor in Oregon suggested it when she first started feeling sick.  (Tr. 463).

In his opinion, the ALJ stated:

Another factor that goes to both claimant's stamina and mental acuity is her ability to produce an extremely detailed journal which purportedly documents how she feels *from one hour to the next*.  Claimant produced a 111 page journal, which is included in the record as Exhibit B19E.  *It appears that if the claimant were to redirect the large amount of energy that she exerts monitoring her disease, she could work a full time job*.  (Exh. B9F, pp. 6, 8, 15, 19, 26, 27, 34)  The claimant reported at the hearing that it does not take her long to complete her daily entries.  Regardless of the amount of time required, the undersigned concludes that is inconsistent with the allegation of profound fatigue and related cognitive difficulties.

42

(emphasis added) (Tr. 24).  Also, at another place in his opinion, he refers to claimant's "extensive daily *hour-by-hour* journaling of how she feels."  (Tr. 23) (emphasis added).

The log is 111 pages long.  But, to put it in perspective, it covers a period of slightly more than four years.  Further, an examination of the log makes clear that it does not represent an "hour-by-hour" chronicling of symptoms.[8]  Finally, and more importantly, the conclusion that Pletsch could work a full time job if she devoted the amount of the energy she was expending monitoring her conditions is the ALJ's.  The citations to the record in his opinion following this conclusion are simply to Dr. Wolf's mention of the log in his clinical records.[9]  (Tr. 24).

Dr. Wolf's clinical notes indicate that when Pletsch would return to him for a visit, she would provide him with latest charts of her daily symptoms since her last visit.  Dr. Wolf also stated that because Pletsch was providing this material and he was including it as part of his file, he did not include in his own clinical notes mention of all of Pletsch's symptoms that were of concern on each visit.   At no point, do Dr. Wolf's notes indicate that he advised Pletsch to stop keeping her diary.  And, Dr. Wolf certainly did not conclude that this effort was an indication she could work full-time.  In fact, his conclusion was that she could not tolerate full-time work.

Dr. Wolf's notes also reflect the fact that Pletsch would often provide him with material related to CFS.  Most of this was material that Pletsch downloaded from the internet, but some of it also came from her father, a retired obstetrician.  (Tr. 376, 385).

_____

[8]    Dr. Wolf does refer in one of his notes to the log covering her symptoms on an hourly basis, but the rest of his references are to it being a daily log and the log itself make clear it is not an hour-by-hour chronicle.

[9]    The doctor who Pletsch saw in North Dakota several times in late 2000 before switching to Dr. Wolf expressed the legitimate concern as to whether the amount of journaling was causing Pletsch to be overly obsessed with her disease.  And, in making these observations, he did at one point state this seemed like a full-time job, but it is doubtful this reference was meant to be taken literally.  (Tr. 404).

The ALJ concluded that the time spent by Pletsch researching her disease was inordinate and inconsistent with her claims of an inability to concentrate and work.  When asked at the hearing how much time she spent doing this, she responded by stating none lately but maybe an hour throughout the day.  It is not at all clear, however that Pletsch meant she was doing this <u>every</u> day for up to an hour.  This is because, after Pletsch responded, the ALJ stated he took it as an "average" and Pletsch did not respond further.  (Tr. 463-464).

In summary, there may very well be appropriate issues regarding whether the amount of internet searching when coupled with the detailed charting of symptoms was to the point where it constituted an unhealthy obsession by Pletsch with her disease.  The conclusion, however, that this evinced an ability to concentrate and work on a full-time basis is not one the undersigned would necessarily draw.

Further, the evidence with respect to the internet searching could also have been viewed in other ways not discussed by the ALJ.  SSR 99-2p recognizes that CFS is not a well understood disease, that the views and opinions of medical sources may be in conflict, and that new information is being generated about it.  Under these circumstances, a person stricken with CFS (which the ALJ found that Pletsch was) would understandably have an interest in learning more about the disease and keeping up with new developments.  This may be particularly true for Pletsch since she was seeing only small-town, general practitioner, which was probably all she could afford given her limited funds and lack of medical insurance.  In fact, at various points in his notes, Dr. Wolf discussed the need for his having to do more research on the latest with respect to CFS, including internet searching, and each time that Pletsch provided information to him, he told her he would review it.  (Tr. 361, 367, 370, 376, 381, 383, 389).

Secondly, the evidence also indicates that, on several occasions when Pletsch provided information to Dr. Wolf, she inquired whether the alternative medicines and treatments suggested in the material would be appropriate for her. (Tr. 365, 370, 374). One inference that could be drawn from this evidence is that Pletsch was attempting to find something that would help her get better.

### 4.    Perceived inconsistencies between Pletsch's claims and the record evidence

The ALJ also points to what he perceives are inconsistencies between Pletsch's claims and the actual record. In two instances, however, the ALJ's statements about what the record showed appear to be inaccurate.

The first has to do with Pletsch's claim that one of her symptoms was low-grade fevers. The ALJ stated that there was no evidence of elevated temperatures until August 2005, which was after the period under consideration, and that, even then, the evidence consisted only of Pletsch's reports and not clinical findings. (Tr. 23). In discussing this perceived incongruity, the ALJ again made reference to Pletsch's internet searching. The implicit, but very clear, suggestion was that this symptom did not appear until after Pletsch's researching about CFS on the internet. (Tr. 23).

As discussed earlier in the summary of the facts, however, no temperatures were recorded by Dr. Wolf or his staff for almost all of Pletsch visits, and it may very well have been that none were taken. Moreover, Pletsch's medical records contain a number of contemporaneous complaints of low-grade fevers prior to August 2005. Low-grade fevers were mentioned as one of Pletsch's symptoms in the report prepared by the clinical psychologist in Oregon in 1999. (Tr. 310). Pletsch complained of being "feverish" in the mornings to Dr. Komorowska in November 2000. (Tr. 401). In his first visit with Pletsch in January 2001, Dr. Wolf notes: "She says she suffers from intermittent

low-grade fever along with her fatigue and weakness." (Tr. 399). Again, in June 2001, Dr. Wolf

states that Pletsch reported: "[s]ometimes fever and chills." (Tr. 391).

Also, as noted above, Dr. Wolf did not chart all of Pletsch's subjective complaints on each

visit because of the written material she was providing to him. And Pletsch's written diary includes

numerous references to elevated temperatures prior to August 2005. Without attempting to be

exhaustive, there are references at Tr. 263, 266, 270, 295, 301. Further, in March and April 2002,

Pletsch made an effort to keep track of her temperatures more frequently and her material includes

a one-page chart recording temperatures that she took during this time frame some of which were

elevated and some of which were not. (Tr. 295).

Another purported inconsistency between Pletsch's claims and the record according to the

ALJ involved Pletsch's claims of sensitivity to light and noise. In his opinion, the ALJ stated that

Pletsch had not expressed either as being of concern during the time period at issue, again implying

these only became an issue after all of her internet searching. (Tr. 23).

The record, however, contains numerous references to light and noise sensitivity both before

and during the time period at issue. For example, in 1999, the clinical psychologist in Oregon noted

Pletsch's problems with concentration, "distractibility," and "straining out extraneous noise." (Tr.

310). In September 2000, Pletsch reported to the intake counselor at BHSC that she was affected

by stress and noise. (Tr. 355). Pletsch made the same complaint to Dr. Boomgaarden in 2001

during her psychological evaluation. (Tr. 345). Dr. Wolf's notes state the following with respect

to a June 2001 visit:

> The patient likes it in the dark, quiet, warm room. She says she is insensitive [sic]
> to bright lights and to noise. The glare on the glass in the computer where she works
> causes some of her headaches.

(Tr. 391). In November 2003, the occupational therapist conducting the FCE reported the following:

Elaine appears to function better when the auditory and visual distractions are at a minimum and this would be a main factor in job consideration and placement for Elaine. This again was not directly assessed, however, or observed during the filling out of the hand and spinal form questionnaire where she requested the door being shut to eliminate external noises.

(Tr. 320).  Finally, in Pletsch's diary, sensitivity to noise and sensitivity to light were included as part of the pe-printed  symptoms to which she assigned a numerical value for the days she claimed to have suffered from the symptoms and her miscellaneous notes are also replete with complaints of light and noise and sensitivity.  (Tr. 193-301).

Aside from the forgoing, the ALJ makes other points in discounting Pletsch's claims regarding the severity of her symptoms that are not necessarily conclusions the undersigned would draw. For example, the ALJ points to the lack of use of pain medication.  Pletsch, however, never claimed that pain was her primary limiting symptom, rather she claims it was overall fatigue.  More importantly, the ALJ does not point to any medical opinion which states that the absence of the necessity for prescription pain medication, if that is what he was referring to, is proof of the absence of disabling chronic fatigue.  Pletsch stated that she took over-the-counter medications such as Aleve and Advil as needed for pain and valerian root for muscle tension. (Tr. 191).  The fact that over-the-counter medications were considered sufficient by Dr. Wolf for the pain symptoms she reported is supported by the record. (Tr. 360, 366, 388, 389).

The ALJ also points to the amount of reading that the claimant professed to do, but did not note her testimony that she found reading less exhausting than TV, and that when she was struggling with her concentration, she could go back and reread what she had read, whereas she could not "rewind" her TV.  (Tr. 474-474).   Her mother made the same observations.  (Tr. 174).

The ALJ mentions her traveling "quite a distance away" once a month to get groceries as an example of daily living activities that were inconsistent with her claimed limitations.  However, he

fails to mention why she limited her trips to once month, which she claims she found exhausting, and the "quite a distance away" was only about 35 miles.  (Tr. 483-484).

The amount of housework that Pletsch professed to do was minimal. According to both Pletsch and her mother, her meal preparation consisted mostly of heating prepared foods.  Also, it does not appear that she traveled any significant distances  and the amount of travel appears to have been  infrequent.

Overall, the conclusion that Pletsch's daily activities were inconsistent with her claims of chronic fatigue is not one that the undersigned would reach.

 **E.**   **Pletsch's argument that the ALJ failed to consider the combination of her impairments**

Pletsch argues the ALJ did not properly take into account the combination of her alleged impairments.  However, in his opinion, the ALJ concluded that Pletsch was suffering from both CFS and RLS.  He also considered the issue of depression and concluded it was not a substantial causative factor of her chronic fatigue, which is supported by the medical evidence.  However, as noted above, he may not have sufficiently considered the mental symptoms associated with CFS given the significant evidence favorable to Pletsch with respect to these symptoms that was not discussed.

 **F**.   **Pletsch's argument that the ALJ should have sought additional clarifying information from her treating physician**

Pletsch argues the ALJ improperly rejected the opinions of treating physicians because he did not request additional information from the physicians seeking clarification of their opinions. She further argues the ALJ should have contacted the treating physicians if he had questions about their opinions or obtained the opinion of a medical expert.

"The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).  The ALJ is not required, however, to contact the treating physician whenever the ALJ rejects that opinion. See Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006); see also 20 C.F.R. §§ 404.1512(e)-(d), 404.1527(c)(3); SSR 96-2p.  Here, the record contains a considerable amount of medical information, and Pletsch has failed to make a cogent argument for why more needed to be acquired.

### G.     The "new evidence" submitted to the Appeals Council

Pletsch argues the Appeals Council failed to review the new evidence submitted along with the request for review.  The Appeals Council looked at the new evidence and found the records did not pertain to the relevant time period and therefore did not provide a basis for changing the ALJ's decision. (Tr. 6).  The relevant time period is prior to June 30, 2004, the date Pletsch was last insured for DIB purposes.  This determination has not been challenged.

The submission of new evidence is covered by 20 C.F.R. § 404.970(b), which reads as follows:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

Evidence submitted with a request for review to the Appeals Council must be considered if it is new, material, and relates to the period on or before the date of the ALJ's decision. Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).  Evidence is "new" if it is more than merely cumulative of other evidence in the record. Id.  Evidence is "material" if it pertains to the time period for which benefits were denied. Id.

49

The additional evidence submitted to the Appeals Council does not appear in the record.  It is unclear whether the four exhibits attached to Pletsch's brief are the exact same additional evidence which was submitted to the Appeals Council, but, in the absence of any suggestion otherwise, the court will assume such.

Exhibit 1 consists of records from the Great Plains Clinic (Dr. Wolf) covering February 23, 2006, to October 11, 2007.  Exhibit 2 is a letter from Dr. Wolf dated November 25, 2007, which relates in part to the relevant time period but also covers his treatment of Pletsch after June 30, 2004.  While post-period medical evidence may have some "longitudinal relevance" given the nature of CFS, the evidence presented here is largely cumulative of what is already in the record.    Exhibit 3 is a letter from Pletsch's supervisor at Head Start.  The letter is dated July 6, 2006, and pertains to Pletsch's work as a part-time administrative assistant from April 20, 2001, to September 7, 2001.  The information presented in the letter is already in the record with respect to an e-mail note that was submitted and discussed earlier.

Exhibit 4 is a functional capacity evaluation conducted on March 9-10, 2006.  It does not appear that the results of this FCE differ materially from the one that was conducted in November 2003, and there is a significant gap in time between the last day of eligibility at the end of June 2004 and the date of this test.

If this matter is not remanded, the failure of the Appeals Council to consider the evidence would not be error given that the evidence is largely cumulative and of diminished relevance.  However, if upon remand it is determined necessary to create an expanded record, it would not be error to include the evidence for what limited value, if any, it may have.

## IV.    **CONCLUSION AND RECOMMENDATION**

Ordinarily, remand for further determination by the agency is the remedy when there are deficiencies in the Commissioner's determination.  It is only when the total record convincingly establishes disability and is transparently one-sided against the Commissioner's decision that a remand for an award and computation of benefits is warranted.  See, e.g. E.g., Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001);  Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991); Jefferey v. Secretary of H.H.S., 849 F.2d 1129, 1133 (8th Cir.1988).   While it may be a close question, such is not the case here given November FCE and the opinions of the non-examining state-agency consultants.

Based on the foregoing, it is hereby **RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 12) be **DENIED**, that Pletsch's Motion for Summary Judgment (Docket No. 8) be **GRANTED** in part, that the decisions of the Commissioner be **REVERSED,** and that this matter be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

## NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 6th day of February 2009.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge